THE STATE OF OHIO, APPELLEE, *v.* VEAL, APPELLANT.

(No. 75AP-379—Decided December 29, 1975.)

*Mr. George C. Smith*, prosecuting attorney, *Mr. Alan C. Travis* and *Mr. David Graeff*, for appellee.

*Mr. Max Kravitz* and *Mr. William S. Lazarow*, for appellant.

REILLY, J. This is an appeal from a judgment of the Court of Common Pleas, Franklin County, Ohio. The transcript indicates that the defendant, the appellant herein, was arrested by the Franklin County Sheriff's Department for a burglary at the residence of Mr. Robert Mativi, 6262 Murmac Lane, Westerville, Ohio, February 5, 1975. He was indicted on one count of aggravated burglary (R. C. 2911.-11.), and one count of theft (R. C. 2913.02).

The transcript shows that a neighbor, Mrs. Clara Ike, testified that she saw a car pull into the Mativis' driveway between 10 a. m. and 11:30 a. m. on the date of the offense. She said she went to investigate and that an individual came up and told her he was looking for a "Mrs. Goss," and that he was there to do some work on her house. She informed him that Mrs. Goss did not live there and he left. Mativi, the owner of the home, testified that when he came

home later that day, several items were missing and others were out of place. They included a Sony television set, a small five-inch television set, two wristwatches, and a Polaroid camera. The neighbor positively identified defendant as the person who drove into the Mativi garage the morning of the offense.

Sergeant Jack Harris of the Franklin County Sheriff's Department, detective bureau, testified as follows concerning defendant's interrogation:

"Q. Calling your attention now to February 19, 1975, did you have an occasion to interrogate the defendant with Detective Mershon?

"A. Right.

"Q. And at that time before interrogating him, did you advise the defendant of his constitutional rights?

"A. Yes, he was advised.

"Q. And what were those rights?

"A. The Miranda Rights Detective Mershon read off to him.

"Q. Before you is a rights' waiver form?

"A. Right.

"Q. Can you identify that form for us, please?

"A. Right, the form here on the stand.

"Q. And whose signatures are on that form?

"A. Detective Mershon and myself.

"Q. Who else's?

"A. And Eugene Veal.

"Q. Is that the rights' waiver form that we are talking about?

"A. Yes.

"Q. And was the signature of the defendant signed in your presence?

"A. Yes, sir.

"Q. Did either you or Detective Mershon read this form to him?

"A. Detective Mershon.

"Q. And did he give, Detective Mershon, give the defendant a chance to read the form?

"A. Yes, he did.

48

"Q. And did he read it, did the defendant read it?

"A. He had it in front of him; I can't remember whether he read it out loud or just to himself.

"Q. Did the defendant appear to be injured or under the influence of any drug or alcohol?

"A. Not at the time I talked with him.

"Q. And he signed it in your presence?

"A. Yes.

"Q. Did he make any statements after he signed that?

"A. I talked to him shortly along with Detective Mershon, and I left out of the room.

"Q. Did he make some oral statements after he signed that form?

"A. Yes.

"Q. Were those statements completely voluntary on his part?

"A. Yes.

"Q. Was there any kind of force or duress used?

"A. No.

"Q. Now, I'd like you to relate for us as best you can remember what the defendant said at that time?

"A. All he talked about was how Mrs. Ike had come up to him while he was at this place in question, in the case here, and how she had talked with him and what a good job he had done on the door, no one could recognize and that he had property in the trunk of his car. I don't know which date it was Detective Mershon was out looking for or had talked with him and how he was in the house looking out at Detective Mershon and some other officers at the time they was looking for him.

"Q. Is there anything else that you can remember about the conversation at all?

"A. He talked about how he had done the job.

"Q. Were those statements made in the course of a conversation?

"A. Yes.

"Q. Did he make any written statement at all?

"A. Not to my knowledge.

"Q. You didn't use any kind of force to have him make those statements?

"A. No, none whatsoever."

The jury found defendant guilty of both counts of the indictment. Subsequently, this appeal was perfected, including three assignments of error. The first assignment of error reads as follows:

"The trial court erred in overruling defendant's motions for acquittal on the aggravated burglary charge since there was no evidence that Robert Mativi was present or likely to be present."

Defendant asserts that the state failed to prove one of the elements of the offense charged. R. C. 2911.11 states, in part:

"(A) No person, by force, stealth, or deception, shall trespass in an occupied structure as defined in section 2909.-01 of the Revised Code, or in a separately secured or separately occupied portion thereof, with purpose to commit therein any theft offense as defined in section 2913.01 of the Revised Code, or any felony, when any of the following apply: * * *

"(3) The occupied structure involved is the permanent or temporary habitation of any person, in which at the time any person is present or likely to be present."

In aggravated burglary there must be some evidence that the occupied structure is a permanent or temporary habitation—namely, a home—while in burglary (R. C. 2911.-12), the state is not required to prove it is a home, but an occupied structure within the definition of R. C. 2909.01. Thus, the real issue is in the type and use of the occupied structure and not literally whether individuals will be home from work or not at a particular time. The evidence in this case was that Mr. and Mrs. Robert Mativi were at work, and the children at school. At any rate, the simple fact that a family has left the residence in the morning does not automatically eliminate the likelihood of their being present. Consequently, where the state proves that an occupied structure is the permanent home of a family and that such was burglarized when the family was temporarily not there, it has presented sufficient evidence for the offense of aggravated burglary. The terms "present or likely to be present" in this context are considered relatively, rather than literal-

ly. If the latter were so, there could be no aggravated burglary, for instance, if members of the family happened to be at a meeting, shopping, social event, church service, athletic contest, or whatever, because, in fact, they would not be "present or likely to be present." Manifestly, this cannot be a rational interpretation of the intent of the statute. Therefore, defendant's first assignment of error is not well taken and is overruled.

As to defendant's second assignment of error, it is reiterated that the structure involved in this offense was the permanent residence of the Mativi family. Furthermore, the facts are uncontroverted that the offense occurred in their home. The difficulty in this case rests with the statute upon which defendant was indicted. The indictment quite clearly includes R. C. 2911.11, or aggravated burglary. It is quite plain from even a cursory reading of the statute that it is subject to possible misunderstanding. In any case, the problem here is that the trial court actually charged upon burglary, rather than aggravated burglary, for which defendant was convicted. There is readily sufficient evidence, however, for an aggravated burglary conviction, which is apparently what the jury found. Nevertheless, even though the trial court did not specifically charge upon aggravated burglary, considering all the facts and evidence in this case, the omission of one element of the offense, concerning the presence or likely presence of persons, is not prejudicial in this case. There is no question that it was the Mativis' home, and that they were living there at the time of the offense. Since they were living there, as noted above, any reasonable person could assume that they might be present or were likely to be present at any time. Moreover, the transcript does not show that the omission was called to the trial court's attention by an objection of counsel or otherwise, in order that it might be corrected. Apparently, it is now initially raised upon appeal. Thus, considering the evidence in this particular case, we find that the trial court's omission was not prejudicial error. (Note *State v. Driscoll*, 106 Ohio St. 33, the second paragraph of the syllabus.) For the foregoing reasons, defendant's second assignment of error is not well taken and is overruled.

Defendant's third assignment of error is that the verdict was against the manifest weight of the evidence. This court has held upon many occasions that if there is sufficient probative evidence to support each element of a criminal charge by the required degree of proof, an appellate court may not set aside a jury verdict because it is against the manifest weight of the evidence. Here, we find there was plainly sufficient evidence before the jury to find defendant guilty of the counts charged in the indictment. Therefore, defendant's third assignment of error is not well taken and is overruled. The judgment of the trial court is affirmed.

*Judgment affirmed.*

STRAUSBAUGH, P. J., and WHITESIDE, J., concur.

WHITESIDE, J., concurring. Although I concur in the judgment, I would predicate overruling of the second assignment of error solely upon the failure of counsel to comply with Crim. R. 30, which provides that "no party may assign as error any portion of the charge or omission therefrom unless he objects" and states "specifically the matter to which he objects and the grounds of his objection." Had counsel objected at the trial to the charge, it would have been prejudicial error for the trial court to fail to correct the omission.